UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MARY GRASSO,

                      Plaintiff,

        -against-

METROPOLITAN TRANSPORTATION
AUTHORITY, and VINCENT GABRIELE,
PATRICIA MCDONNELL, JEFF CARTY,
AUBREY GREENIDGE, CRAIG VUKOV,
ANTHONY SCOCA, in their individual capacities,

                      Defendants.

------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
15-cv-02693 (JMA) (AYS)

**APPEARANCES:**

Rick Ostrove
Leeds Brown Law, P.C.
One Old Country Road, Suite 347
Carle Place, NY 11514
    *Attorney for Plaintiff*

Steve S. Efron
237 West 35th Street, Suite 1502
New York, NY 10001
    *Attorney for Long Island Bus Company Defendants*

**AZRACK, United States District Judge:**

    Plaintiff, Mary Grasso ("Plaintiff" or "Grasso") brings this action against her former employer, defendant Metropolitan Transportation Authority Long Island Bus Company ("LIB"), alleging that LIB engaged in disability discrimination in the form of failure to accommodate and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and New York State Human Rights Law ("NYSHRL"), Executive Law § 290 et seq. Plaintiff also brings claims against individual defendants Vincent Gabriele, Patricia McDonnell, Aubrey Greenidge, Anthony Scoca, and Craig Vukov ("Individual Defendants" and together, with LIB,

"Defendants") for aiding and abetting in violation of the NYSHRL[1].  Defendants have moved for summary judgment on all claims.  For the reasons stated below, Defendants' motion is **DENIED**.

## I. BACKGROUND

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements, the declarations, exhibits, and testimony referenced therein, and any additional statements of material facts provided in the parties' briefings.  The facts are undisputed unless otherwise noted.  When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant," in this case Plaintiff. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

## A. Medical Conditions

Plaintiff has been diagnosed with asthma and chronic obstructive lung disease ("COLD").  Plaintiff developed respiratory problems sometime before 2011 (she could not recall the year) and since 2009, her "breathing, walking, performing manual tasks and [] respiratory functions [have been] substantially impaired."  (July 21, 2017 Deposition of Mary Grasso ("Grasso July Dep.") 45-46, ECF No. 101-9; Affidavit of Mary Grasso in Opposition to Summary Judgment ("Grasso Aff.") ¶ 2, ECF No. 101.)

Plaintiff has also been diagnosed with bulging disks in her neck and back.  (Pl.'s 56.1 Counterstatement ("Pl.'s 56.1") ¶¶ 26–27, ECF No. 103.)  Plaintiff began to notice problems with her back in 2004.  (Grasso Aff. ¶ 3.)  Plaintiff attests that by 2011, she "could not sit or stand as long as" she had been previously able to, could not stand for more than ten minutes without substantial pain, could not walk long distances, and had difficulty performing manual tasks.  (Id.)

---

[1]  Defendants also suggest that Plaintiff is bringing a hostile work environment claim.  (Defendants' Summary Judgment Memorandum of Law ("Defs. Brief") at 13, ECF No. 99.)  It is not clear from the Amended Complaint that she is.  (ECF No. 8.)  Plaintiff does not respond to Defendants' argument on this claim in her opposition.  To the extent Plaintiff also brought a hostile work environment claim, she has waived any argument as to it.

She also could not clean her house due to difficulty lifting and bending and had difficulty blow drying her hair because of the pain in her neck.  (Id.)  Plaintiff testified that her symptoms include: "shooting pains into my sides.  I get a lot of nerve pain.  My right leg goes numb.  My feet hurt . . . The doctor told me the shooting pains in the sides are from the back.  And my neck, the whole left side is – my elbow hurts. My hands go numb."  (Dep. of Mary Grasso, January 22, 2018 ("Grasso January Dep.") at 62, ECF Nos. 98-1, 101-8, 105-5.)  "[S]tanding too long" and "sitting too long" trigger her to have problems with her back.  (Grasso July Dep. 71.)  When asked in her deposition what life activities her bulging disk affects, she stated: "I wouldn't go on rides.  I wouldn't go on jet skis.  I wouldn't go on snowmobiles. I wouldn't try to ski."  (Grasso January Dep. 63.)  Plaintiff explained that an accident that occurred while she was working also contributed to her conditions—she was rear-ended while operating a bus in 2004.  (Grasso July Dep. 70.)  To treat her condition, Plaintiff received cortisone shots, acupuncture, physical therapy, and prescription Motrin.  (Grasso Aff. ¶ 4.)

**B. Employment with LIB**

LIB hired Plaintiff in 1993.  (Defs.' Local Rule 56.1 Statement of Undisputed Material Facts ("Defs.' 56.1") ¶ 1, ECF No. 100.)  Plaintiff worked as a bus operator for LIB, stationed at its Rockville Centre Bus Depot ("Bus Depot") until January 1, 2012[2].  (Id. ¶ 2.)  During 2011, LIB employed "older" buses and "newer" buses.  (Id. ¶ 3.)  Older buses included those in the 1500 and 1600 series, while newer buses included those in the 1700 and 1800 series.  (Id.)  Plaintiff asserts that the seats on the older buses caused her pain and exacerbated her neck and back problems.  (Pl.'s. 56.1 ¶ 3; Grasso July Dep. 92-93, 99-100, 148-51.)  In her deposition, Plaintiff explained:

---

[2]  On January 1, 2012, LIB transferred its facilities and operations to Veoila Transportation Services (later renamed Transdev).  Plaintiff was hired by Transdev.  Transdev was a defendant in this action but entered into a settlement, on behalf of itself and the individuals it employed, with Plaintiff for all conduct that occurred on or after January 1, 2012.  (ECF Nos. 89, 90.)

"the older buses were the 15[00]s and 1600s.  Most of those seats, you knew if you sat in it, it was broken. They were sunken in. They were ripped. The cushion was – it was horrible. Twisted sideways." (Grasso July Dep. 92-93; see also id. 148-51 ("They were ripped. They were broken. They bounced.  The new buses, they were more sturdy.  They were firm . . . And then after being used, they get sunken in . . . it's so painful")).  When asked in her deposition how long it took for a seat on the bus to cause her pain, Plaintiff testified: "[i]f it was a seat that was sunken in and off, after the first round trip . . . You get the shooting pains and nerve pain."  (Id. 78.)  Plaintiff explained that if she continued driving the bus after the first-round trip, her right leg would become numb.  She described the pain as a level 10 out of 10 and testified that she would sometimes cry when she drove the bus due to the pain.  (Id. 78-79.)  She testified that she would "work through the pain" but sometimes the pain would be so bad she would need to go home sick.  (Id. 95-96.) Plaintiff also explained that on the older buses, "[t]he gas pedal was different.  The brake, when you step on the brake, I would get shooting pains up my leg." (Id. 72-73.)  Plaintiff contends that there were sometimes issues with newer buses as well, but the problems with the seats and pedals were more common in the older buses.  (Pl.'s 56.1 ¶ 18; see Grasso July Dep. 92-93.)  Plaintiff also testified that on some buses "the suspensions were shot. You hit a little bump, and it felt like you hit – fell in a manhole." (Grasso July Dep. 150.)

A dispatcher would assign each driver a bus at the beginning of each shift.  (Defs.' 56.1 ¶ 4.)  Drivers who had "straight" shifts—which required them to be on the road for at least eight hours—were traditionally assigned newer buses.  (Id. ¶ 5.)  Drivers who had "split shifts," which required them to be on the road for two-to-three hours, were traditionally assigned older buses. (Id.)  In 2011, Plaintiff opted to receive "straight" shifts beginning at 5:00 am each morning.  (Id. ¶ 6.)  According to Plaintiff and defendant Anthony Scoca, who was a dispatcher for LIB, there

was always a newer bus in LIB's garage at 5:00 am.  (Pl.'s 56.1 ¶ 6; Dep. of Anthony Scoca ("Scoca Dep.") at 35, ECF No. 98-4.)

**C. June 8, 2011 Incident and Aftermath**

On the morning of June 8, 2011, Plaintiff reported to work and received an 1800-series bus. (Defs.' 56.1 ¶ 7; Dispatcher's June 8, 2011 Pull-Out Sheet, ECF No. 98-9.)   It was approximately 95-100 degrees outside that day.  (Pl's 56.1 ¶ 8.)  The air conditioner in the bus either malfunctioned while Plaintiff was already on her route or, as Plaintiff contends, was not functioning from the outset of her shift.  (Id.)  Either way, Plaintiff was instructed to return the bus to the Bus Depot to get a different bus to continue her shift.  (Defs.' 56.1 ¶ 9.)  Upon returning to the Bus Depot, Craig Vukov, a Bus Operator and Shop Steward for LIB, gave Plaintiff an old 1600 series bus, which was the next available bus.  (Id. ¶ 10.)  Plaintiff testified that the bus was "blowing fumes through the air conditioner," (Grasso July Dep. 53), and that it smelled.  (Defs.' 56.1 ¶ 10; see also Scoca Dep. 47; Dep. of Craig Vukov ("Vukov Dep.") 35, ECF No. 98-5.) However, Vukov and Scoca testified that they had not noticed any issue with the bus.  (Defs.' 56.1 ¶ 11; Vukov Dep. at 45.)  Plaintiff testified that she told Vukov that "this bus smells" and he responded that she should "go drive the bus."  She then told him: "You know I have a problem." (Grasso July Dep. 53.)

Plaintiff proceeded to drive the bus, explaining that she felt that if she did not drive the bus, she might get fired.  (Grasso January Dep. 227-28.)  After beginning her route, Plaintiff asserts that the fumes worsened.  (Pl.'s 56.1 ¶ 10.)  Plaintiff testified that she called Vukov and told him about the fumes and he told her to "[d]rive the fucking bus." (Grasso July Dep. 53.)  Plaintiff then called command, who told her to return the bus to the Bus Depot, which she did.  (Pl's 56.1 ¶ 10.) Plaintiff testified that Paul Sawak, Depot Manager for Mechanics, inspected her bus and indicated that the fumes were entering the bus because of an open vent.  (Id. ¶ 11.)  She asserts that when

Sawak talked to Vukov about the fumes, Vukov responded "Fuck [Grasso] . . . she's crazy and that's that."  (Id.)

The next day, Plaintiff met with Vincent Gabriele, the Assistant Location Chief for the Bus Depot.  (Grasso July Dep. 119.)  She testified that she "tried to talk to [Gabriele] before I asked for the reasonable accommodation."  (Id. 59.)  Gabriele told Plaintiff, "You can't go around here saying you're only going to drive new buses," to which Plaintiff replied that she never said she would only drive new buses.  (Id. 119-20.)  Plaintiff then told Gabriele: "I have a bad neck, and I have lung problems. I'm not lying.  I could die on the bus. I still come to work every day."  (Id. 120.)  Gabriele responded, "[e]veryone has problems. You'll be driving an old bus for a while." (Id. 59-60, 120.)

Grasso asserts that following this encounter, Gabriele retaliated against her by instructing Scoca to assign Grasso exclusively to older buses for a two-week period.  (Pl.'s 56.1 ¶ 31.) Defendants dispute this assertion.  (Defs.' Resp. to Pl.'s 56.1 ¶ 31, ECF No. 106.)  However, Scoca testified that Gabriele instructed him to assign Grasso to older buses for the two-week period. (Scoca Dep. 68-70.)  Though newer buses were available at the beginning of Grasso's shift each day, Scoca assigned her to older buses because he had "no choice" and feared that he would be punished by Gabriele if he provided Grasso with a newer bus.  (Id.)

Sometime around mid-to-late June, Plaintiff testified that she spoke to Patricia McDonnell, LIB's Director of Human Resources, or another person in Human Resources, and explained that she was "being harassed [and] made fun of."  (Pl.'s 56.1 ¶ 34; Grasso July Dep. 67.)  Grasso testified that the conversation was "not [] nice" and she "felt like nobody wanted to help [her]." (Grasso July Dep. 66-67.)  Defendants dispute Grasso's recollection of the phone call.  McDonnell testified that it was a "positive" conversation and that she instructed Grasso to provide written

documentation to support her request for an accommodation.  (Defs.' Resp. to Pl.'s 56.1 ¶ 34; Dep. of Patricia McDonnell ("McDonnell Dep.") 12, ECF No. 98-6.)

**D. June 22, 2011 Request for Reasonable Accommodation**

On June 22, 2011, Grasso submitted a letter to McDonnell—the subject of which was "Special Accommodation Consideration."  (Defs.' 56.1 ¶ 13; ECF 98-11.)  Attached to the letter was a note from Dr. Steven Orshan, a pulmonologist, who stated:

> [Grasso] has both chronic obstructive lung disease and asthma.  Due to the pulmonary problems, I think that she cannot drive a bus that is not air conditioned.  In addition, she states that some of the buses have difficulty with fumes and she certainly cannot tolerate extraneous fumes.

(Pl.'s 56.1 ¶ 13–14; ECF 98-11.)  After reviewing the documentation, LIB granted Grasso's request for a reasonable accommodation and advised relevant personnel that "during the summer months, Ms. Mary Grasso will require a bus to drive that is air conditioned."  (June 27, 2011 Mem. from Patricia McDonnell to Stephen Martini, ECF No. 98-12.)  Grasso testified that during the summer months she was able to get a bus with air-conditioning most of the time but she did not file formal grievances when she received a bus without a fully functioning air conditioner because she feared retaliation.  (Pl.'s Defs.' 56.1 ¶ 15; see also Grasso July Dep. 68-69).

**E. Grasso's July 5, 2011 Request for Reasonable Accommodation**

In July 2011, Plaintiff complained to McDonnell that operating the older buses caused her to experience back and leg pain.  (Defs.' 56.1 ¶ 17.)  On July 5, 2011, Plaintiff submitted a note from Dr. Sunil Butani that stated: "Please provide special accommodation for [Plaintiff] to drive new bus.  [Plaintiff] has disability with regards to [her] lower back, neck, (r) hip, [and] right ankle."  (Defs.' 56.1 ¶ 16; July 5, 2011 Note from Dr. Sunil Butani, ECF No. 98-13.)  McDonnell testified that she spoke with Dr. Mark Wishnuff from Meridian, the employee health services for LIB, who agreed with Dr. Butani that Plaintiff should get a newer bus.  (McDonnell Depo. 32.)  McDonnell

testified that she next conferred with Stephen Martini, Assistant General Manager for Depot Operations, who told her that from an operational standpoint it was not possible to guarantee that Grasso would receive a newer bus on each of her shifts.   (Defs.' 56.1 ¶ 19; see McDonnell Dep. 34-36; Dep. of Stephen Martini 20-22, ECF No. 98-3.)  Martini testified that "[t]o request for a new bus on a regular basis is unreasonable."  (Martini Dep. 20.)  On July 20, 2011, Dr. Wishnuff wrote to McDonnell stating:

> Mary Grasso brought in a note from her pmd, Dr. Butan[i] that she has a disability of her low back, neck, right hip, and right ankle and she should be accom[mo]dated with a new bus.  This seems appropriate given her medical conditions, however, it has been explained by mana[]gement that this may not always be possible due to limited availab[i]lity of the new buses.

(ECF No. 98-14.)   Instead, Dr. Wishnuff recommended that Grasso use a seat cushion.  (Id.)  On July 22, 2011, McDonnell wrote a letter denying Plaintiff the accommodation.  The letter stated in full:

> Please be advised that Medical reviewed your new documentation for a reasonable accommodation, specifically you are requesting a new bus for all of your tour of duties. This request is not reasonable.  Medical has indicated that you should use a seat cushion while you are driving a bus.  I strongly suggest that you speak to your private physician on what seat cushion would be best suited for you.

(Defs.' 56.1 ¶ 20; ECF No. 98-15.)  Grasso attested that, either before or after she received the letter, she told McDonnell that she was already using a seat cushion and it was not particularly helpful because the buses' seats were broken.  (Pl.'s 56.1 ¶ 20; Grasso Aff. ¶ 5.)  McDonnell testified that she informed Grasso that she would be provided a newer bus "when possible," even though the July 22, 2011 letter did not say this.  (McDonnell Dep. 60–63.)  McDonnell testified that when she told Plaintiff this, Plaintiff was not happy and "said she needed a new bus all of the time."  (Id. 63.)  However, Grasso attested that after she received the letter, she called McDonnell to complain.  (Grasso Aff. ¶ 5.)  McDonnell told her "that she could not do anything about it

because the decision regarding the accommodation came from above her, and that she could not

help me." (Id.)  Grasso also attested that in this conversation she told McDonnell: "that I came in

at 5:00 a.m. and that bus[]es were available.  I told her that they were doing this to me out of spite

because I requested an accommodation.  She told me that there was nothing she could do about

it." (Id.)  Grasso also testified that "[t]hey could have said, whenever possible, we will do it."

(Grasso July Dep. 172-73.)

Plaintiff was assigned an older bus on three occasions in August 2011.  (Pl's 56.1 ¶ 36.)

## F. Overtime

Plaintiff continued to work, including overtime.  (Id. ¶ 24.)  Plaintiff testified that she

worked a lot of overtime in her last few months of employment with LIB.  (Id.)  Plaintiff testified:

> I don't think I lost any overtime. Maybe I sometimes didn't want to work because
> of what dispatcher was there and, you know, who was not being nice or, should I
> say, doing the right thing. I don't know how to word it. I remember even in 2011
> an incident, and I said, You know, if you give me a good bus, I'll do the overtime
> for you. And he said, You get what is there. You know, it was always a good bus
> there.

(Grasso July Dep. 39-40.)  In her affidavit submitted with her opposition to Defendants' motion

for summary judgment, Plaintiff stated:

> On or about October 2011, I sought to do overtime. Scoca told me words to the
> effect of, 'You get whatever bus you get, there is nothing special about overtime.'
> I took this as a threat that if I did overtime, Scoca would assign me an old bus.
> Indeed, after Scoca made this statement, he assigned me an old bus to drive.
> Accordingly, I was unable to perform overtime when Scoca was working, as it was
> not feasible for me to drive an old bus due to my disabilities. I lost overtime
> opportunities as a result and thus overtime income.

(Grasso Aff. ¶ 7.)

## G. EEOC and New York State Division of Human Rights Filings

Plaintiff filed an EEOC Intake Questionnaire on July 25, 2011.  (Pl.'s 56.1 ¶ 35.)  On

October 4, 2011, Grasso filed a Charge of Discrimination with the New York State Division of

Human Rights and EEOC.  (Id. ¶ 37.)  Defendants assert that they did not receive a copy of Grasso's EEOC Intake Questionnaire or receive notice about its filing before October 2011. (Reply Mem. of Law of Defendants ("Defs.' Reply") at 5, ECF No. 104.)

## II.  DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).  To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita, 475 U.S. at 587 (internal quotation marks and citation omitted).  The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586

(citations omitted).

Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment.  See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate.  Anderson, 477 U.S. at 249.

In an employment discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  Id.  The Second Circuit has recognized, however, that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).  Thus, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'"  Id.  (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

## B. Failure to Accommodate

Defendants argue that summary judgment should be granted as to Plaintiff's failure to accommodate claims because:  (1)  Plaintiff's bulging disks in her neck and back do not constitute a disability under the ADA; (2) the accommodation requested by Plaintiff on July 5, 2011 to drive newer buses was unreasonable; and (3) Plaintiff did not need an accommodation because Plaintiff continued to work, including overtime, after the accommodation for newer buses was denied. (ECF No. 99 at 8-10; ECF No. 104 at 8-10.)

**1. Standard**

"Discrimination in violation of the ADA includes, inter alia, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"   McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)).   "A plaintiff makes out a prima facie case of disability discrimination based on a failure to accommodate by showing that (1) [s]he has a disability within the meaning of the ADA; (2) [her] employer is covered by the statute and had notice of that disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) [her] employer has refused to make such accommodations."   Wenc v. New London Bd. of Educ., 702 F. App'x 27, 29 (2d Cir. 2017).

With regard to the first prong, under the ADA, disability is defined as: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.   42 U.S.C. § 12102(1).   "For a plaintiff to establish that he has a disability under the statute's first subsection (i.e., to show that he is actually disabled), he must (1) show that he suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that his impairment substantially limits the major life activity previously identified."   Anderson v. Nat'l Grid, PLC, 93 F. Supp. 3d 120, 132 (E.D.N.Y. 2015) (quotations and alterations omitted).

With regard to the third and fourth prongs, "[p]laintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to meet the essential eligibility requirements of the position, after which defendant bears the burden of proving that the requested accommodation is not reasonable."   Wenc, 702 F. App'x at 29 (internal

quotations omitted).  The reasonableness of an employer's accommodation is "a fact-specific question that often must be resolved by a factfinder," but an employer is "entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable," without any "need to engage in further burden-shifting."  Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 94 (2d Cir. 2015) (internal quotation marks omitted).

The analysis for a claim of failure to accommodate under the NYSHRL is substantially the same as under the ADA.  Ferraro v. New York City Dep't of Educ., 404 F. Supp. 3d 691, 713 (E.D.N.Y. 2017), aff'd, 752 F. App'x 70 (2d Cir. 2018).  Therefore, the Court analyzes the ADA and NYSHRL failure to accommodate claims together.

**2. Disability**

Defendants first argue that Plaintiff's bulging disks in her neck and back and the pain caused by them do not constitute a disability under the ADA because the pain she suffered does not rise to the level of a disability.  Specifically, Defendants argue that Plaintiff has not shown that her condition substantially limits Plaintiff's major life activities.  The Court disagrees.

The Americans with Disabilities Act Amendments Act (ADAAA) directs courts to construe the term disability "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [ADA]."  42 U.S.C. § 12102(4)(A).  Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending . . ."  42 U.S.C. § 12102(2).  Plaintiff attests that she could not stand for more than ten minutes without substantial pain, could not sit or stand as long as she was previously able to, could not walk long distances, and has difficulties with lifting and bending so cannot clean her home.  (Grasso Aff. ¶ 3.)  Plaintiff also testified that standing and sitting for "too long" caused her back problems and testified extensively about the

pain she experienced while sitting and operating the bus.[3]   (See, e.g., Grasso July Dep. 71 ("standing too long" and "sitting too long" trigger her to have problems with her back)).   Courts have found that inability to sit for long periods may constitute a disability within the meaning of the ADA.   See E.E.O.C. v. Yellow Freight Sys., Inc., No. 98-CV-2270, 2002 WL 31011859, at *21 (S.D.N.Y. Sept. 9, 2002) (finding that the plaintiff, a truck driver, was disabled within the meaning of the ADA where plaintiff had a back problem and could sit for, at most, forty-five minutes at a time without experiencing pain that required him to stand up and stretch).

Furthermore, notes from medical experts support Plaintiff's contentions regarding her condition.   First, Dr. Butani wrote a note requesting that Plaintiff be provided with newer buses and stating that Plaintiff "has disability with regards to [her] lower back, neck, (r) hip, [and] right ankle." (ECF No. 98-13.)   Additionally, Dr. Wishnuff stated that the accommodation request for newer buses "seems appropriate given her medical conditions." (ECF No. 98-14.)   An independent medical examination also supports Plaintiff's contentions.   Although it was performed in 2013, it includes notes on Plaintiff's medical history including that on March 10, 2011, an MRI of the cervical spine showed that Plaintiff had "mild posterior disc bulge," a doctor's note on July 5, 2011 noted that Plaintiff had low back, neck and ankle injuries, a doctor's note on May 10, 2011 stated that Plaintiff had a 30 pound carrying limitation, and in 2011, Dr. Butani prescribed physical therapy and a trigger point injection to Plaintiff's spine. (ECF No. 101-2.)   Therefore, at minimum, there is a question of fact whether Plaintiff's major life activities were substantially limited.

---

[3]   When asked during her January 2018 deposition what life activities her bulging disks affect, Plaintiff testified that "I wouldn't go on rides.  I wouldn't go on jet skis.  I wouldn't go on snowmobiles. I wouldn't try to ski." (Grasso January Dep. at 63.)  This response does not preclude her from submitting an affidavit regarding other limitations, particularly given that "life activities" is a legal term of art and her testimony only concerned activities that she was completely precluded from engaging in.

### 3. Reasonable Accommodation

Defendants argue that the accommodation requested was unreasonable. "[O]nce Plaintiff puts forth a prima facie case, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship." Scalera v. Electrograph Sys., 848 F.Supp.2d 352, 360 (E.D.N.Y. 2012) (citations omitted). "Undue hardship" is defined as: "an action requiring significant difficulty or expense . . ." 42 U.S.C. § 12111(10)(A). The factors taken into account when determining whether a reasonable accommodation would put an undue hardship on a business include: "the nature and cost of the accommodation;" "the overall financial resources of the facility or facilities;" "the number of persons employed at such facility;" "the effect on expenses and resources;" "the overall financial resources of the covered entity;" "the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities;" and "the type of operation or operations of the covered entity . . ." Id. at § 12111(10)(B); see also Hernandez v. Int'l Shoppes, LLC, 100 F. Supp. 3d 232, 251 (E.D.N.Y. 2015).

Defendants have not met their burden of showing that the request for newer buses was an undue hardship. McDonnell and Martini testified only that Martini determined that Plaintiff's request was "unreasonable" without explaining how LIB came to this determination. Martini testified that: "To request for a new bus on a regular basis is unreasonable . . . All the buses are equipped with air ride seats. To single out a single bus for a single person with the volume of pull-outs we have would put some sort of strain on the dispatcher's duty. It would be rather burdensome. All the buses are maintained in the same fashion . . . And it didn't seem reasonable to do this." (Martini Depo. 21-22.) Martini did not recall speaking with anyone else or reviewing any documentation before coming to this conclusion. (Id.) Defendants do not give any further

explanation of their reasoning in determining the request was unreasonable. For example, they do not state what the cost would have been, why it would have been operationally burdensome, or what factors they took into account in making this determination. To the contrary, the testimony in the record suggests that Plaintiff's request—or, at the very least, providing a new bus whenever possible—may have reasonable and not an undue hardship.[4] Both Plaintiff and Scoca testified that there were "always" newer buses available at 5:00 a.m. when Plaintiff began her shift, and that employees who performed straight shifts, which Plaintiff did, tended to be assigned newer buses. (Def's. 56.1 ¶ 5.) Moreover, the fact that LIB provided Plaintiff with air-conditioned buses in the summer as a reasonable accommodation for her asthma and COLD further indicates that, at least some accommodation in which newer buses were provided to Plaintiff would have been reasonable and not an undue hardship.

Furthermore, "[i]t is well-settled that the ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Tillman v. Verizon New York, Inc., 118 F. Supp. 3d 515, 538–39 (E.D.N.Y. 2015) (internal quotations and alterations omitted). Additionally, "[t]he NYSHRL [] require[s] that an employer engage a disabled employee in a good-faith interactive process to identify what reasonable accommodations are appropriate. New York courts have held that the failure to engage in an interactive process is itself a violation of the law and gives rise to an independent claim." Thomson v. Odyssey House, No. 14-CV-3857, 2015 WL 5561209, at *19 (E.D.N.Y. Sept. 21, 2015), aff'd, 652 F. App'x 44 (2d Cir. 2016) (internal citations and quotation

---

[4] Defendants note in their reply brief that Plaintiff received buses on 19 of the 22 days she worked in August 2011. Defendants' papers, however, do not address all of the months at issue. Perhaps, at trial, Defendants can establish that, in practice, Plaintiff did, in fact, receive newer buses whenever possible and that this was a sufficiently reasonable accommodation.

marks omitted).  "Engaging in an interactive process might include meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome."  Geoghan v. Long Island R.R., No. 06-CV-1435, 2009 WL 982451, at *23 (E.D.N.Y. 2009) (alterations and quotations omitted).

McDonnell testified that, although LIB denied Plaintiff's request for an accommodation, she told Plaintiff newer buses would be provided "when possible."  (McDonnell Dep. 60-61.) McDonnell testified that when she told Plaintiff this, Plaintiff was not happy and "said she needed a new bus all of the time."  (Id. 63.)  This testimony suggests that Defendants engaged in the interactive process and may have offered Plaintiff a reasonable accommodation.  (See also n. 4 supra.)   However, Plaintiff denies McDonnell's version of events and attests that McDonnell instead told her that there was "nothing she could do" about LIB's decision not to grant the accommodation. (Grasso Aff. ¶ 5.)   Furthermore, the July 22, 2011 letter denying the accommodation makes no mention of providing newer buses "when possible."  (ECF No. 98-15.) There is, therefore, at least an issue of fact as to whether Defendants engaged in an interactive process and provided a reasonable accommodation.

Finally, Defendants argue that Plaintiff did not need the accommodation for newer buses because she continued to work, including overtime, after the accommodation was denied.  (Defs.' Reply at 9-10.)  Defendants suggest that because Plaintiff was able to get a newer bus most days in August 2011 and she continued to work even though driving the older buses allegedly caused her serious pain, Plaintiff did not require an accommodation.  (ECF No. 104 at 9-10.)  This argument is unavailing.  See Yellow Freight Sys., Inc., 2002 WL 31011859, at *21 (company

proposed that a bus driver with a back impairment "pull his truck off the road and stretch every so often," but the court explained that "[a]n accommodation that aggravates the symptoms of a disability, rather than mitigates their effect on the employee's ability to perform, is no accommodation at all."); cf. Durick v. New York City Dep't of Educ., 202 F. Supp. 3d 277, 292 (E.D.N.Y. 2016) (holding that an accommodation must be "effective" meaning "that it allow[s] [plaintiff] to 'perform the essential functions of [her] position ... [or] enjoy equal benefits and privileges of employment'" and finding that there was a question of fact as to whether the accommodation given to plaintiff, who suffered from severe osteoarthritis in her knees, of handicapped parking was effective when her request for specific parking that would have allowed her to avoid steps and walk the shortest distance to the entrance was denied and the walk from her current parking spot was "brutal").

Therefore, Defendants' motion for summary judgment on the failure to accommodate claims is denied.

## C. Retaliation Claim

Defendants argue that Plaintiff has not established a viable retaliation claim because: (1) Plaintiff's conversations with Gabriele and other employees on June 8 and 9, 2011 about the bus with the fumes did not constitute protected activity; (2) Gabriele's assignment of Plaintiff to older buses for two weeks is not an adverse action; and (3) Plaintiff's claim that she was denied overtime due to retaliation is conclusory and contradicted by certain evidence.

### 1. Standard for Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse

employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citations omitted).  "The plaintiff's burden in this regard is de minimis, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  Id. (internal quotations omitted).

Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination, and may take the form of either formal or informal complaints." Chan v. Donahoe, 63 F. Supp. 3d 271, 294 (E.D.N.Y. 2014) (citations omitted).  "The formal or informal complaint must put the employer on notice that the plaintiff believed that discrimination was occurring." Hernandez, 100 F. Supp. 3d at 267 (E.D.N.Y. 2015).

To show an adverse employment action, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Harvin v. Manhattan & Bronx Surface Transit Operating Auth., No. 14-CV-5125, 2018 WL 1603872, at *9 (E.D.N.Y. Mar. 30, 2018), aff'd, 767 F. App'x 123 (2d Cir. 2019) (quotations omitted).

Generally, causation can be shown "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Sivio v. Vill. Care Max, 436 F. Supp. 3d 778, 799 (S.D.N.Y. 2020) (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

"If the plaintiff establishes a prima facie case, a presumption of discrimination

or retaliation is created and the burden shifts to the employer to articulate a 'legitimate, nondiscriminatory reason' for the adverse employment action." Id. at 799.

"NYSHRL retaliation claims are analyzed under the same framework as their federal counterparts." D'Antonio v. Petro, Inc., No. 14-CV-2697, 2017 WL 1184163, at *11 (E.D.N.Y. Mar. 29, 2017). Therefore, the Court analyzes the ADA and NYSHRL retaliation claims together.

### 2. Gabriele Assigning Plaintiff Older Buses

First, Defendants argue that Plaintiff did not engage in protected activity prior to Gabriele assigning Plaintiff to older buses for a two-week period. (Defs.' Brief at 14-15; Defs.' Reply at 2-4.) However, the record, construed in the light most favorable to Plaintiff, is sufficient to establish that Plaintiff engaged in protected activity through her complaints on June 8 and June 9, 2011.

Plaintiff testified that on June 8, 2011, she was given a bus that was "blowing fumes through the air conditioner" and smelled. (Grasso July Dep. at 53; Pl's 56.1 ¶ 10.) Plaintiff testified that she told Vukov that "this bus smells" and he responded "go drive the bus." (Grasso July Dep. 53.) She then told him: "You know I have a problem." (Id.) Plaintiff testified that while driving the bus, the fumes worsened. She called Vukov and told him about the fumes and he told her to "[d]rive the fucking bus." (Id.) The next day she met with Gabriele. Gabriele told Plaintiff: "You can't go around here saying you're only going to drive new buses." Plaintiff told Gabriele that she never said she would only drive newer buses. (Id. 119-20.) Plaintiff testified that then she told Gabriele: "I have a bad neck, and I have lung problems. I'm not lying. I could die on the bus. I still come to work every day." (Id. 120.) Gabriele responded, "[e]veryone has problems. You'll be driving an old bus for a while." (Id. 59-60, 120.)

Taken together, Plaintiff's complaints about the conditions of the buses over the course of these two days are sufficient for a jury to conclude that she engaged in protected activity. She

explained that she had problems with her back, neck, and lungs and complained multiple times about the conditions of the buses she had been assigned.  "Requests for disability accommodation and complaints, whether formal or informal, about working conditions related to one's alleged disability are protected activities."  Gorbea v. Verizon New York, Inc., No. 11-CV-3758, 2014 WL 917198, at *11 (E.D.N.Y. Mar. 10, 2014); see also King v. Town of Wallkill, 302 F. Supp. 2d 279, 293 (S.D.N.Y. 2004) ("informal complaints to management constitute protected activities") (citing Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002)).  Defendants argue that because Plaintiff told Gabriele that she did not say she would only ever drive newer buses without exception, she was not requesting an accommodation and therefore, not engaging in protected activity.  (Defs.' Reply at 3-4.)  That argument is unavailing.  A jury could find that Plaintiff complained, at the very least, about the condition of one bus and connected that complaint to her back, neck, and lung issues.

Second, Defendants argue that Plaintiff cannot show that "her complaint was met with an adverse employment action."  (Defs.' Brief at 15.)  Here, Gabriele ordered that Plaintiff be relegated to driving older buses for a two-week period, which she claims exacerbated her breathing problems, back, and neck pain.  Scoca testified that Gabriele instructed him to assign Grasso to older buses for the two-week period.  (Scoca Dep. 68-70.)  Though newer buses were available at the beginning of Grasso's shift each day, Scoca assigned her to older buses because he had "no choice" and feared that he would be punished by Gabriele if he provided Grasso with a newer bus. (Id.)  Relegating Plaintiff to the older buses that exacerbated her lung, back, and neck conditions is sufficient to show an adverse employment action.  See Taylor v. New York City Dep't of Educ., No. 11-CV-3582, 2012 WL 5989874, at *9 (E.D.N.Y. Nov. 30, 2012) (in the context of a Title VII retaliation claim, the Second Circuit has found that "assignment to [a] classroom on [the] fifth

21

floor which aggravated teacher's physical disabilities may qualify as adverse employment actions for purposes of a retaliation claim") (citing Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 226 (2d Cir. 2006)); see also Keating v. Gaffney, 182 F. Supp. 2d 278, 280 (E.D.N.Y. 2001) (denying a motion to dismiss and finding an adverse employment action where plaintiff, who suffered from several medical conditions and had an intolerance to heat, initially worked in an area with access to shelter to periodically avoid the heat, but was later transferred to a location that did not have that same access, and his health suffered.  His supervisor repeatedly refused to transfer him back to a position with access to shelter and instead said '[Y]ou are in my [expletive deleted] world now.'").

Courts have also found that altering a plaintiff's working conditions with the intent to harass her, as here, may constitute an adverse action.  See Schmitt v. City of New York, No. 15-CV-05992, 2018 WL 5777019, at *8 (E.D.N.Y. 2018) (in the context of a discrimination claim, a jury could find that a supervisor's transfer of plaintiff to a different squad in order to harass him was an adverse action); Terry v. Ashcroft, 336 F.3d 128, 144 (2d Cir. 2003) (finding that transferring an employee "with the intent to harass him" may be a material adverse employment action in the context of a retaliation claim, where that employee "put forth evidence sufficient to permit a trier-of-fact to conclude that his supervisors believed that he would find the new assignment to be adverse.").

Defendants do not challenge the causation element and there are no factual issues as to causation.  There is sufficient evidence in the record for a jury to conclude that Plaintiff engaged in protected activity and suffered an adverse action, the only two elements of Plaintiff's retaliation that Defendants challenge here for Plaintiff's claim that her assignment to old buses for two weeks was retaliatory.

### 3. Overtime

Defendants next argue that Plaintiff's claim that she lost overtime due to retaliation is conclusory and contradicted by payroll records. The Court finds that there is an issue of fact as to this claim. Plaintiff testified that she sometimes did not want to work overtime because some of the dispatchers on duty would not "do[] the right thing." (Grasso July Dep. 39-40.) She recounted an incident in October 2011 when she told Scoca that she would work overtime when he was on duty if he would give her a "good bus." Scoca told her either "[y]ou get what is there" or "[y]ou get whatever bus you get, there is nothing special about overtime." (Id.; Grasso Aff. ¶ 7.) Plaintiff contends that she took this as a threat that if she did overtime, Scoca would assign her to an older bus. After making this statement, he then did assign her to an older bus. (Grasso Aff. ¶ 7.) Plaintiff contends that she lost overtime opportunities because she could not work overtime when Scoca was on duty because he would give her an older bus. (Id.)

Defendants counter that Plaintiff stated in her deposition testimony that "I don't think I lost any overtime" but do not acknowledge that she qualified that statement by saying she sometimes did not work overtime because of certain dispatchers and recounted the incident with Scoca. (Defs.' Reply at 7.) Defendants contend that Plaintiff's claim is conclusory, but Plaintiff points to the specific incident that occurred with Scoca. Defendants also argue that Plaintiff worked more overtime hours in the last two weeks of October than previously and cite to payroll records. (Id.) However, just because Plaintiff worked overtime during this period does not show that Plaintiff did not lose any overtime opportunities. While these records are certainly probative, there is still, at minimum, a question of fact as to whether Plaintiff did not work overtime on at least one day because of Scoca's threat.

Finally, Defendants argue that even if Plaintiff did lose overtime, there was not a causal

connection between any of the alleged protected activity and the adverse action of losing overtime. Causal connection can be shown "indirectly, by showing that the protected activity was followed closely by discriminatory treatment" or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Sivio, 436 F. Supp. 3d at 799. Here, there is indirect evidence of causation—Plaintiff requested to work overtime and asked if Scoca would provide her with a newer bus. Scoca then told her "[y]ou get whatever bus you get, there is nothing special about overtime" and proceeded to assign her to an older bus. This is indirect evidence of a causal connection through temporal proximity. Plaintiff also contends she perceived Scoca's words as a threat, although it is a close question whether a jury could find this statement alone to be evidence of retaliatory animus. Ultimately, all of the evidence above is sufficient to show a causal connection.

The Court finds that there is, at minimum, a question of fact as to whether Plaintiff lost any overtime because of her complaints. Therefore, summary judgment is denied as to Plaintiff's retaliation claims.

## D. **NYSHRL Claim Against the Individual Defendants**

Finally, Defendants argue that Plaintiff's aiding and abetting claim pursuant to Section 296 of the NYSHRL against the Individual Defendants must fail because her ADA and NYSHRL claims against LIB should not survive summary judgment. Defendants do not advance any other arguments concerning the liability of the Individual Defendants under the NYSHRL. Because the Court finds that Plaintiff's ADA and NYSHRL claims against LIB survive summary judgment, the Court denies the motion for summary judgment as to the Individual Defendants.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **DENIED**.

**SO ORDERED.**

Dated:  March 31, 2021
         Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE
